UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 26-CR-80063-ARTAU/REINHART

Case No. _____

18 U.S.C. § 1031(a)

UNITED STATES OF AMERICA

vs.

AP OF SOUTH FLORIDA, LLC,
    d/b/a FIORELLA INSURANCE AGENCY,

Defendant.

_____/

FILED BY_____ *BM* ____D.C.

*Apr 6, 2026*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### The Patient Protection and Affordable Care Act ("ACA") and ACA Plans

1.      In 2010, Congress enacted the ACA in part to expand Americans' access to affordable health insurance. The ACA sought to accomplish this, in part, through federal subsidies that reduced the cost of health insurance for eligible consumers.

2.      The ACA established a premium tax credit, also known as a "subsidy," which was a refundable tax credit designed to assist eligible individuals and families in affording health insurance purchased through an "Exchange." An Exchange was an entity that made Qualified Health Plans ("QHPs") available to qualified individuals. QHPs offered over an Exchange are referred to herein as "ACA Plans." In Florida, the Exchange used the HealthCare.gov platform,

which was operated by the Centers for Medicare and Medicaid Services ("CMS"). Private insurers offered ACA Plans through the Exchange.

3. To be eligible for a subsidized ACA Plan in Florida, an individual's projected household income generally was required to be greater than 100% and less than 400% of the federal poverty line. In 2021 and extended through 2025, COVID-19-related legislation temporarily eliminated the income cap for subsidies, making subsidies available for some consumers whose incomes exceeded 400% of the federal poverty line. Individuals with projected incomes below the federal poverty line did not qualify for a federal subsidy.

4. The amount of the subsidy available to an eligible consumer was based on a sliding scale; consumers with lower qualifying incomes received a larger subsidy, while consumers with higher qualifying incomes received a smaller subsidy.

5. The Internal Revenue Service ("IRS") issued a publication stating that, to be eligible for a subsidy, a consumer must have a household income of at least 100% of the federal poverty line for the relevant family size, among other requirements. The IRS publication clarified that, "[f]or individuals with household income below 100% of the federal poverty line," consumers may be eligible for an exception allowing the subsidy. "However, the exception … does not apply if, with intentional or reckless disregard for the facts, you provide incorrect information to the Marketplace for the year of coverage. You provide information with intentional disregard for the facts if you know that the information provided is inaccurate. You provide information with a reckless disregard for the facts if you make little or no effort to determine whether the information provided is accurate and your lack of effort to provide accurate information is substantially different from what a reasonable person would do under the circumstances." IRS Pub. 974 (2019).

6.    Consumers who were eligible for a subsidy could elect to receive it in advance, or they could claim it as a lump sum tax credit when they filed a tax return. If a consumer elected advanced payments of the subsidy, this was known as an advance premium tax credit ("APTC").

7.    CMS and the IRS established annual Agreed Upon Procedures governing the process through which CMS authorized the payment of subsidies, including APTCs. Once authorized, the APTC was transmitted directly to the insurer offering the ACA Plan in the form of a payment toward the applicable monthly premium. These federal subsidies were funded through an indefinite refund appropriation administered by the IRS.

8.    Consumers who elected to receive subsidy payments in advance in the form of an APTC were required to reconcile the amount advanced with the actual subsidy for which the consumer was determined to be eligible when a tax return was filed for the applicable year. As a result, in some circumstances, a consumer could be responsible for paying back some of the subsidy. This repayment obligation could arise if the consumer's income, family size, or other circumstances changed during the year.

### Medicaid

9.    The Florida Medicaid program ("Medicaid") provided benefits to certain low-income individuals. Subsidized ACA Plans were not available to individuals who were eligible for Medicaid.

10.    The Florida Department of Children and Families ("DCF") Automated Community Connection to Economic Self Sufficiency ("ACCESS") system maintained an online portal called MyACCESS that allowed Floridians to access their public assistance information, including Medicaid information. Consumers could apply for Medicaid through MyACCESS and receive any notices about their application.

11. Before determining whether a consumer who had applied for an ACA Plan was eligible, the Exchange determined whether, based in part on the information represented in the consumer's ACA Plan application, the consumer would be eligible for Medicaid or the Children's Health Insurance program ("CHIP"). In the event a consumer was found to be potentially eligible for Medicaid or CHIP, the Exchange transferred the account to DCF. If a consumer reported an income at or above the federal poverty line, the consumer generally was not eligible for Medicaid or CHIP absent other specific eligibility criteria such as disability or pregnancy.

### Open Enrollment and Special Enrollment Periods

12. Consumers were permitted to enroll in ACA Plans during the annual open enrollment period. Open enrollment occurred during a set period each year, typically between November 1 of the calendar year preceding the benefit year through a date in December of the same year or January of the benefit year.

13. A consumer was permitted to enroll in an ACA Plan outside of open enrollment if the consumer qualified for a special enrollment period ("SEP") triggered by certain qualifying life events ("QLEs"). SEPs lasted for 60 days following a QLE.

14. QLEs included change in primary place of living, loss of health insurance, change in household size, and change in eligibility for ACA Plan coverage, among others.

15. In some circumstances, applying for and being denied Medicaid was a QLE. Specifically, consumers could apply for an ACA Plan during a SEP if they had applied for Medicaid during open enrollment or due to a QLE, and were determined either after open enrollment or more than 60 days after the QLE to be ineligible for Medicaid.

16. During the COVID-19 pandemic, CMS created an additional SEP that allowed consumers in states with Exchanges served by the HealthCare.gov platform to enroll in ACA Plans for benefit year 2021. This SEP was available from February 15, 2021, through August 15, 2021.

17. Beginning on or about March 18, 2022, CMS created an additional SEP applicable to consumers who were eligible for APTCs, who had an estimated annual household income at or below 150% of the federal poverty level in their state, and who were not eligible for Medicaid. This SEP was extended through at least 2025. This SEP did not change the requirements to receive a subsidy.

**ACA Plan Application Process**

18. Consumers could apply for ACA Plans online through HealthCare.gov. Consumers could apply directly by entering personal information into the online application, or they could provide their information to an intermediary that applied on their behalf. Individuals or their representatives were required to provide information on their applications demonstrating eligibility for federal subsidies for an ACA Plan.

19. ACA Plan applications on HealthCare.gov included an electronic signature that required consumers to agree to the following attestation: "I'm signing this application under penalty of perjury, which means I've provided true answers to all of the questions to the best of my knowledge. I know I may be subject to penalties under the federal law if I intentionally provide false information."

20. After initially determining that a consumer was eligible for an ACA Plan and determining the amount of any subsidy, the Exchange and CMS often sought to verify and supplement information provided by the consumer. When doing so, the Exchange and CMS provided written notices explaining what information was requested. For example, the Exchange

often sought to verify annual income estimates, incarceration status, citizenship status, and other information.

21.     Consumers were allowed at least 90 days from the date of their eligibility notice to provide any additional information requested by the Exchange and CMS. If the consumer missed the deadline, the Exchange made a new determination of the ACA Plan and subsidy amount for which the consumer qualified. This new determination could result in a consumer receiving a lower subsidy or losing the subsidy altogether. If a consumer lost the subsidy or received a lower subsidy, the consumer typically could remain enrolled in the ACA Plan but would be financially responsible for a higher monthly premium payment on that ACA Plan.

## The Defendant, Related Entities, and Relevant Persons

22.     From in or around August 1988, through in or around February 2021, Fiorella Insurance Agency, Inc. ("Fiorella") was an insurance brokerage company. Defendant **AP of South Florida, LLC ("APSF")** was incorporated under the laws of Florida in or around January 2021. In or around February 2021, APSF purchased certain assets of Fiorella. After this asset purchase, APSF did business as "Fiorella Insurance Agency," and many of the managers and employees who had worked at Fiorella were hired as employees of APSF. Fiorella and APSF marketed and sold ACA Plans throughout Florida.

23.     Strong Opportunities, LLC d/b/a Florida Care Insurance ("Florida Care") was a company formed under the laws of Florida. Florida Care marketed ACA Plans to consumers in Florida and in other states.

24.     Cory Lloyd ("Lloyd"), a resident of Martin County, Florida, was a part-owner of Fiorella until the APSF asset purchase. From in or around September 2016 through in or around

6

February 2021, Lloyd also served as Fiorella's Chief Operating Officer. After the Fiorella asset purchase, Lloyd became President of APSF and he served in that position until November 2022.

25.     Dafud Iza ("Iza"), a resident of Martin County, Florida, was an Executive Vice President at Fiorella and, after the Fiorella asset purchase, an Executive Vice President at APSF.

26.     Steven Strong, a resident of Tarrant County, Texas, was the president and owner of Florida Care.

27.     Insurer 1 was a company incorporated under the laws of Florida. Insurer 1 provided health insurance plans throughout Florida, including federally subsidized ACA Plans. Insurer 1 paid commissions to Fiorella and APSF for enrolling consumers in ACA Plans issued by Insurer 1.

### Major Fraud Against The United States
### (18 U.S.C. §§ 1031 and 2)

From in or around February 2021, and continuing through in or around September 2022, in Miami-Dade, Broward, Palm Beach, and St. Lucie Counties, in the Southern District of Florida, and elsewhere, the defendant,

### AP OF SOUTH FLORIDA, LLC,

did knowingly execute, and attempt to execute, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, in a contract, subcontract, subsidy, guarantee, insurance, and other form of Federal assistance, the value of such contract, subsidy, guarantee, insurance, and other form of Federal assistance, and any constituent part thereof, being $1,000,000 or more.

## Purpose of the Scheme and Artifice

28.     It was a purpose of the scheme and artifice for the defendant and its accomplices to unlawfully enrich themselves by, among other things: (a) deceptively marketing subsidized ACA Plans to ineligible consumers who were homeless, unemployed, and had no income, including paying bribes to induce certain consumers to agree to enroll in such plans; (b) falsely inflating consumer income projections on ACA Plan applications in order to make the consumer appear qualified for a subsidized ACA Plan and, in turn, maximize enrollments and commission payments from Insurer 1 to APSF; (c) submitting and causing the submission of false and fraudulent applications for subsidized ACA Plans on behalf of consumers who did not qualify for such subsidies and, at times, who did not authorize the submissions; (d) concealing the submission of false and fraudulent applications for subsidized ACA Plans, including by interfering with the Exchange's and CMS's attempts to verify statements about income contained on ACA Plan applications; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## The Scheme and Artifice

The manner and means by which the defendant and its accomplices sought to accomplish the purpose of the scheme and artifice included, among other things:

29.     In or around February 2021, APSF purchased certain assets of Fiorella, and, through Lloyd, Iza, and other employees, continued many of Fiorella's business practices, including, as described herein, the acquisition of consumers for enrollment in ACA Plans through a process known as "street marketing" and the enrollment of these consumers in fully subsidized ACA Plans for which most of these consumers did not qualify.

30. APSF received commission payments and other payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

31. APSF paid Florida Care to solicit consumers to enroll in subsidized ACA Plans, including by engaging in "street marketing." As part of this street marketing, marketers working for Florida Care targeted vulnerable, low-income persons and persons experiencing homelessness, unemployment, and mental health and substance abuse disorders, at and near homeless shelters, bus stops, drug treatment clinics, and similar locations.

32. APSF, through Lloyd, Iza, and other employees working on its behalf, enrolled consumers in subsidized ACA Plans, even though Lloyd, Iza, and other employees knew that Florida Care marketers working on APSF's behalf had, at times, offered bribes in the form of cash and gift cards to induce certain consumers to agree to enroll; coached certain consumers on how to falsely respond to application questions to maximize the subsidy amount; and at times provided addresses and social security numbers that did not match the consumer purportedly applying.

33. APSF, through Lloyd, Iza, and other employees working on its behalf, enrolled consumers in subsidized ACA Plans, even though Lloyd and Iza knew that the consumers did not qualify for a subsidized ACA Plan because they did not make, and had no legitimate expectation of making, the minimum income required to receive a subsidy for an ACA Plan.

34. APSF, through Lloyd, Iza, and other supervisory employees, directed its employees to use misleading call scripts and other deceptive sales techniques to induce consumers to falsely represent that they would attempt to make the minimum income necessary to qualify for a subsidized ACA Plan, even when the consumer initially projected zero income.

9

35.     APSF, through Lloyd, Iza, and other employees, at times submitted ACA Plan applications on behalf of consumers who did not authorize or consent to the submission of such applications.

36.     APSF, through Lloyd, Iza, and other employees, directed employees to falsely represent that consumers had experienced a "loss of coverage" or other "life change" in response to the Exchange and CMS's requests for verification of income and other information for successfully-enrolled consumers, in order to extend deadlines for responding to verification requests, falsely make consumers appear eligible for subsidies, and enable APSF to continue to receive commissions from Insurer 1.

37.     APSF, through Lloyd, Iza, and other employees, directed employees to submit Medicaid applications through MyACCESS on behalf of consumers that were designed to cause Medicaid to automatically deny the application, regardless of whether the consumer in fact qualified for Medicaid. APSF directed employees to represent in these Medicaid applications, among other things, that the consumers were unemployed, did not expect to start working, and had no other sources of income. APSF directed employees to use these Medicaid denials to trigger an SEP and circumvent the restrictions of open enrollment to enroll consumers in ACA Plans year-round.

38.     APSF, through Lloyd, Iza, and other employees, submitted and caused the submission of applications for subsidized ACA Plans on behalf of consumers who were not eligible for such subsidies, including consumers who were enrolled in other health care plans and programs, such as Medicaid and local assistance programs.

39.     APSF, through Lloyd, Iza, and other employees, also maintained ACA Plans that had been falsely and fraudulently enrolled by Fiorella through the deceptive means described above.

40.     As a result of these false and fraudulent enrollments, some consumers experienced disruptions in their medical care, including disruptions in the treatment of mental health, substance abuse, and other disorders. At times, consumers faced unaffordable co-pays and other costs because APSF, through Lloyd, Iza, and other employees, enrolled these consumers in plans without regard to the consumers' medical needs, the availability of other programs (including Medicaid and local assistance programs), and consumers' ability to pay out-of-pocket costs. Some consumers who APSF fraudulently enrolled into fully subsidized ACA Plans lost access to free health benefits through Medicaid or local assistance programs, and as a result such consumers faced increased costs in accessing HIV medication, medication to treat opioid dependence, and medication to treat mental health disorders.

41.     APSF, through Lloyd, Iza, and other employees, submitted and caused the submission of, and maintained, false and fraudulent enrollments in ACA Plans, causing CMS and the IRS to award at least $141.5 million in subsidies, of which at least $102.7 million was paid out.

42.     Insurer 1 paid APSF millions of dollars in commission and other payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

43.     APSF paid Strong, and companies owned by Strong, millions of dollars in commission payments in exchange for referring consumers to enroll in ACA Plans.

44.     APSF and its accomplices used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

## Act in Execution of the Scheme and Artifice

On or about April 8, 2021, in furtherance of the above-described scheme and artifice, APSF submitted, and caused the submission of, an ACA Plan application in the name of P.B. seeking a fully-subsidized ACA Plan with Insurer 1 (the "P.B. Application"). In the P.B. Application, APSF, through Lloyd, Iza, and other employees, falsely represented, and caused the false representation, that P.B.'s projected annual income was $13,100. Based on this projected annual income, CMS approved the P.B. Application and enrolled P.B. in an ACA Plan with Insurer 1 with a subsidy amount of approximately $348.46 per month.

In violation of Title 18, United States Code, Sections 1031 and 2.

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMIE DE BOER
ASSISTANT CHIEF

D. KEITH CLOUSER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

12

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:**  26-CR-80063-ARTAU/REINHART

v.

AP OF SOUTH FLORIDA, LLC,
d/b/a FIORELLA INSURANCE AGENCY,
_____ /
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)

☐ Miami   ☐ Key West   ☐ FTP
☐ FTL   ☑ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take ___0___ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☑  0 to 5 days
   II  ☐  6 to 10 days
   III ☐  11 to 20 days
   IV  ☐  21 to 60 days
   V   ☐  61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Donald M. Middlebrooks  Case No. 25-CR-80015; Rodney Smith 24-CR-80154
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
JAMIE DE BOER
DOJ Trial Attorney
SDFL Court ID No.   A5502601

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:  **AP OF SOUTH FLORIDA, LLC, d/b/a Fiorella Insurance Agency**

**Case No**: _____

**Count #**:   1

Title 18, United States Code, Section 1031

Major Fraud Against the United States

\* **Max. Term of Imprisonment**:    N/A

\* **Mandatory Min. Term of Imprisonment (if applicable)**:   N/A

\* **Max. Supervised Release**:   N/A

\* **Max. Fine**:    $10,000,000 or twice the gross pecuniary gain or gross pecuniary loss
                        resulting from the offense, whichever is greatest.

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. **26-CR-80063-ARTAU/REINHART** |
| AP OF SOUTH FLORIDA, LLC, | ) | |
| d/b/a FIORELLA INSURANCE AGENCY, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*