# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

AP OF SOUTH FLORIDA, LLC,
d/b/a FIORELLA INSURANCE AGENCY,

Defendant.

_____/

CRIMINAL NO. _____

VIOLATION:

18 U.S.C. § 1031

## PLEA AGREEMENT

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the Defendant, AP of South Florida, LLC (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Managers, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

### Term of the Defendant's Obligations Under the Agreement

1. The Defendant's obligations under the Agreement shall be effective for a period beginning on the date on which the Information is filed and ending one year from that date (the "Term"). The Defendant agrees, however, that in the event the Fraud Section determines, in its sole discretion, that the Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Fraud Section, in its sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 25-28 below. Any extension of the Term extends all terms of

1

this Agreement, including the Notice Requirements described in Paragraph 12, except for the term of probation, which may be extended only with approval from the Court, for an equivalent period.

### The Defendant's Agreement

2.  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the United States District Court for Southern District of Florida and to plead guilty to a single count criminal Information charging the Defendant with one count of Major Fraud Against the United States, in violation of Title 18, United States Code, Section 1031.  The Defendant further agrees to persist in that plea through sentencing and to cooperate fully with the Fraud Section as set forth in Paragraph 10.

3.  The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

   a. The Defendant knowingly used or tried to use a scheme with the intent to defraud the United States or to get money or property by using materially false or fraudulent pretenses, representations, or promises;

   b. The scheme took place as part of a grant, contract, subcontract, subsidy, loan, guarantee, insurance, and other form of Federal assistance;

   c. The value of the grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, was $1,000,000 or more.

4.  The Defendant understands and agrees that this Agreement is between the Fraud Section and the Defendant and does not bind any other Division or Section of the Department of

Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Fraud Section will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

5.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Managers in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Managers, on behalf of the Defendant.

6.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

a.      the nature and seriousness of the offense conduct, as described in the Statement of Facts, including the Defendant's participation in a fraud scheme that involved the submission of thousands of false and fraudulent enrollment applications to the Affordable Care Act Marketplace causing the Centers for Medicare and Medicaid Services ("CMS") to authorize the payment of at least $141.5 million in subsidies that it would not have otherwise paid, including for individuals who, by virtue of their fraudulent enrollment, unwittingly lost their coverage under

3

other health insurance programs; the fraud began at a legacy entity, certain of whose assets were purchased by and integrated into the Defendant in February 2021; the Defendant's failure to conduct adequate acquisition diligence, oversee the acquired operations, and detect the open and pervasive fraudulent scheme, which allowed the conduct to persist within the Defendant for approximately 18 months after the asset purchase, during which time CMS authorized approximately 60% of the fraudulently obtained subsidies; and the pervasiveness of the offense, which involved multiple of the Defendant's former employees and former members of its senior executive management, including its president, who personally conducted and promoted the scheme;

b.      the Defendant did not receive voluntary disclosure credit pursuant to the Department's Corporate Enforcement and Voluntary Self-Disclosure Policy ("CEP"), or pursuant to U.S.S.G. § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

c.      the Defendant received credit for its cooperation with the Fraud Section's investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Defendant also received cooperation credit pursuant to the CEP. Such cooperation included, among other things: (i) expedited document productions, including beginning productions within 10 days and substantially completing productions within eight weeks, that were costly and cumbersome for the Defendant to complete given the large volume of records at issue in this case; (ii) identification and production of over 600 specifically requested call recordings, which involved a manual matching process and sorting through a collection of millions of recordings; (iii) factual

4

presentations from the Defendant regarding its criminal liability, which included highlighting documents and supplying information about the individuals involved in the conduct described in the Statement of Facts; and (iv) assistance with the authentication of evidence used in the trial of two individual defendants in a related case.

d.      the Defendant provided to the Fraud Section all relevant non-privileged facts known to it prior to the Agreement, including information about the individuals involved in the conduct described in the Statement of Facts;

e.      the Defendant also received remediation credit pursuant to the CEP for engaging in limited remedial measures, including terminating individuals who created and directed the fraudulent scheme and others involved in the misconduct and taking steps to terminate the fraudulent scheme, however, those remedial measures were incomplete.  In particular, the Defendant failed to take any independent steps to end the payment of subsidies related to fraudulent enrollments or calculate or make restitution, or address affected individuals who lost health care insurance coverage as a result of the fraudulent scheme. Therefore, the Fraud Section determined that a reduction of 30 percent off the bottom of the applicable Sentencing Guidelines fine range was appropriate pursuant to the CEP based on the Defendant's cooperation, as described in paragraph 7(c), and remediation;

f.      during the period of the conduct described in the statement of facts, the Defendant's compliance program was inadequate and ineffective; because the Defendant has ceased operations, the Fraud Section determined that an independent compliance monitor is unnecessary;

5

g.      the Defendant has no prior criminal, civil, or regulatory enforcement history;

h.      the Defendant has agreed to resolve concurrently a separate investigation by the U.S. Department of Justice, Civil Division, Fraud Section ("DOJ Civil") relating, in part, to the conduct described in the Statement of Facts;

i.      the Defendant has agreed to continue to cooperate with the Fraud Section in any ongoing investigation as described in Paragraph 10;

j.      the Defendant has agreed to mail notification statements to consumers the United States identifies as having been fraudulently enrolled (to the extent the Defendant's records contain mailing addresses for such consumers) and to post notices at public locations in Florida, including locations where the accomplices recruited individuals who were fraudulently enrolled through the Affordable Care Act Marketplace, a list of which will be provided by the United States; and

k.      the Defendant met its burden of establishing an inability to pay the criminal penalty sought by the Fraud Section.  The Fraud Section, with the assistance of a forensic accounting expert, conducted an independent ability to pay analysis, considering a range of factors outlined in the Justice Department's Inability to Pay Guidance (see October 8, 2019 Memorandum from Assistant Attorney General Brian Benczkowski to All Criminal Division Personnel re: Evaluating a Business Organization's Inability to Pay a Criminal Fine or Criminal Monetary Penalty), including but not limited to: (i) the factors outlined in 18 U.S.C. § 3572 and the United States Sentencing Guidelines § 8C3.3(b); (ii) the Defendant's current financial condition; (iii) the

Defendant's alternative sources of capital; and (iv) the collateral consequences of the imposition of the full criminal penalty amount;

l.  accordingly, after considering (a) through (k) above, the Fraud Section has determined that the appropriate resolution of this case is a guilty plea to the Information with a term of one-year to provide adequate time for the victim notice obligations as set forth in Paragraph 12; restitution of $27,630,820, to be paid as set forth in Paragraph 22(a-e), based on the inability to pay analysis and the Fraud Section's interest in ensuring maximum restitution. This resolution is sufficient, but not greater than necessary, to achieve the purposes described in 18 U.S.C. § 3553(a).

8.  The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.  to plead guilty as set forth in this Agreement;

b.  to abide by all sentencing stipulations contained in this Agreement;

c.  to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.  to commit no further crimes;

e.  to be truthful at all times with the Court;

f.  to pay the applicable restitution and special assessment;

g.  to provide victim notice as described in Paragraph 12; and

h.  to cooperate fully with the Fraud Section as described in Paragraph 10.

9.  Except as may otherwise be agreed by the parties in connection with a particular

7

transaction, the Defendant agrees that in the event that, during the Term, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to determine a breach under this Agreement is applicable in full force to that entity.  The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Defendant shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Defendant engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 25-28.  Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

8

10.     The Defendant shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section at any time during the Term.  At the request of the Fraud Section, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section or any other component of the Department of Justice at any time during the Term.  The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such assertion.  The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.     The Defendant represents that it has timely and truthfully disclosed all relevant factual information about which the Defendant has any knowledge with respect to the Defendant's activities, those of its present or former parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, relating to the conduct described in the Information and the Statement of Facts and other conduct known by the Defendant to be under investigation by the Fraud Section. The Defendant further agrees that it shall promptly and truthfully disclose all factual information with respect to its activities, those of

9

its affiliates, and those of its present and former directors, officers, employees, agents, and consultants related to the conduct described in this Agreement or the Statement of Facts about which the Defendant shall gain any knowledge or about which the Fraud Section has inquired or may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section, upon request, any document, record, or other tangible evidence about which the Fraud Section may inquire of the Defendant, including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.        Upon request of the Fraud Section, the Defendant shall designate knowledgeable employees, agents, officers, or attorneys to provide to the Fraud Section the information and materials described in Paragraph 10(a) above on behalf of the Defendant.  It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

c.        The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents, and consultants of the Defendant.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.        With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities including United States

10

authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

11.     The Defendant agrees that any restitution imposed by the Court will be due and payable as specified in Paragraph 22 below.  The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Florida the mandatory special assessment of $400 per count within ten business days of the date of sentencing.

## Public Notices

12.     The Defendant agrees to mail victim notification statements to consumers fraudulently enrolled (to the extent the Defendant's records contain mailing addresses for such consumers) and to post victim notices at certain public locations in Florida as specified by a list of locations and victims to be provided by the United States.

## The United States' Agreement

13.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section agrees it will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates relating to (a) any of the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement, or (b) information made known to the Fraud Section prior to the date of this Agreement.  This Agreement does not provide any protection against, and the Fraud Section may use any information related to the conduct described in the Statement of Facts against Defendant in, any prosecution or other proceeding relating to (a) obstruction of justice; (b) perjury or making a false statement; (c) any crime of violence or terrorism-related offense; or (d) a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against

11

prosecution for any future conduct by the Defendant or any of its direct or indirect affiliates, subsidiaries, officers, directors, employees, agents, or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

14.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.

### Factual Basis

15.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Statement of Facts, and that the Information and Statement of Facts accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud Section, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

### The Defendant's Waiver of Rights, Including the Right to Appeal

16.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the

extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in Attachment A, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving the Fraud Section and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including USSG § 1B1.1(a)) that the Statement of Facts set forth in the Statement of Facts should be suppressed or is otherwise inadmissible as evidence (in any form).  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section has fulfilled all of its obligations under this Agreement and the Court has accepted the guilty plea, the Defendant nevertheless withdraws its guilty plea.

17.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this agreement, the Defendant surrenders certain rights as provided in this agreement.  The Defendant understands that the rights of criminal defendants include the following:

(a)     the right to plead not guilty and to persist in that plea;

13

(b)     the right to a jury trial;

(c)     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

(d)     the right at trial to confront and cross-examine adverse witnesses, to testify and present evidence, and to compel the attendance of witnesses; and

(e)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

18.     The Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum set forth in this agreement (or the manner in which that sentence was determined) on any ground whatsoever except those specifically excepted in this Agreement, in exchange for the commitments made by the United States in this Agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant also knowingly waives the right to bring any collateral challenge challenging either the conviction, or the sentence imposed in this case.  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.  The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Statement of Facts or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction

is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea, plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Fraud Section is free to take any position on appeal or any other post-judgment matter.  The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## Penalty

19.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1031, is: (a) a fine of $10,000,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Codes, Section 1031(c) 3571(c)-(d); (b) five years' probation, Title 18, United States Code, Section 3561(c)(1); (c) a mandatory special assessment of $400 per count, Title 18, United States Code, Section 3013(a)(2)(B); and (d) restitution in the amount ordered by the Court, Title 18, United States Code, Section 3663.  In this case, the parties agree that the gross pecuniary loss resulting from the offense is at least $141,500,000.  Therefore, pursuant to Title 18, United States Code, Section 3571(d), the maximum fine that may be imposed is $283,000,000.

## Sentencing Recommendation

20.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the Sentencing

15

Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 22.

21.     The Fraud Section and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.    Offense Level.  Based upon U.S.S.G. § 2B1.1, the total offense level is 32, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 6 |
| (b)(1)(M) | Loss Greater than $65,000,000 | +24 |
| (b)(10)(C) | Sophisticated Means | +2 |
| **TOTAL** | | 32 |

b.    Base Fine.  Based upon U.S.S.G. § 8C2.4(a)(3), the base fine is $141,500,000 (the pecuniary loss from the offense)

c.    Culpability Score.  Based upon U.S.S.G. § 8C2.5, the culpability score is 5, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(4) | the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | The organization fully cooperated in the investigation | |

16

and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct

-2

**TOTAL** 5

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $141,500,000 |
| Multipliers | 1.00(min)/2.00 (max) |
| Fine Range | $141,500,000 (min)/<br>$283,000,000 (max) |

22.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section and the Defendant agree that the following represents the appropriate sentence in this case:

a.  <u>Disposition</u>.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Fraud Section and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose a sentence, as set forth below.  Specifically, the parties agree, based on the application of the Sentencing Guidelines, that the appropriate total criminal fine is $99,050,000, subject to a reduction based on the Defendant's ability to pay that amount as detailed below.  This reflects a 30 percent discount off the low-end of the Sentencing Guidelines fine range taking into account the Defendant's cooperation and remediation, as well as its prior history, pursuant to the Department's Corporate Enforcement and Voluntary Self-Disclosure Policy.

b.  The Defendant has represented, and the Fraud Section has independently verified, that the Defendant has an inability to pay a criminal fine, restitution, or any other amount in excess of a total of $27,630,820.  The Defendant will pay only restitution, pursuant to Paragraph

17

22(d-e), based on the Defendant's inability to pay and the Fraud Section's interest in ensuring maximum restitution.  The Defendant and the Fraud Section agree that this is appropriate given the facts and circumstances of this case, including the factors described in Paragraph 7 and those in Title 18, United States Code, Section 3553(a).

c.   Forfeiture is not applicable to the offense charged.

d.   Restitution. The Defendant agrees the restitution owed to the United States related to the Defendant's conduct is $102,700,000.  The Defendant agrees to pay restitution in the amount of $27,630,820, based upon the Defendant's inability to pay and as agreed upon by the parties, pursuant to Title 18, United States Code, Section 3663(a)(3).  No later than ten days after the filing of the Information, the Defendant shall establish an escrow account into which it shall deposit $27,630,820.  No monies shall be paid out of the escrow account unless and until ordered by the Court for restitution, pursuant to Paragraph 22(e).

e.   The Defendant agrees to pay restitution if ordered by the Court to consumers fraudulently enrolled with valid restitution claims brought within nine months of the date on which the Information is filed.  Any restitution amounts ordered by the Court to be paid to consumers fraudulently enrolled will be paid out of the escrow account established pursuant to Paragraph 22(d).  The Defendant agrees that any amount remaining in the escrow account within twelve months of the date on which the Information is filed shall be paid as restitution to the United States.   Restitution is final and shall not be refunded.  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to any fine, penalty, restitution, or disgorgement amounts that Defendant pays pursuant to the Agreement, or any other agreement entered into with an enforcement authority or regulator

18

concerning the facts set forth in the Statement of Facts. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of the restitution.

   f. <u>Probation</u>. The Fraud Section and the Defendant agree that a term of organizational probation for a period of one year shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraph 8(a)-(h) above as well as payment of the restitution amount set forth in Paragraph 22(d-e).

   g. <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Florida within (10) ten days of the time of sentencing the mandatory special assessment of $400.

23. This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

24. The Defendant and the Fraud Section waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court within twelve months of the date on which the Information is filed. The Defendant understands that the decision whether

to proceed with the sentencing without a PSR is exclusively that of the Court.  In the event the Court directs the preparation of a PSR, the Fraud Section will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

### Breach of Agreement

25.     If, during the term,  the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 10 of this Agreement; (d) commits any acts that, had they occurred within the jurisdictional reach of the U.S. fraud statutes would be a violation of the U.S. fraud statutes; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, additional charges arising out of the conduct described in the Statement of Facts, distinct from the charges in the Information described in Paragraph 3, as well as charges related to any additional conduct, if appropriate.  Such charges may be pursued by the Fraud Section in the U.S. District Court for the Southern District of Florida or any other appropriate venue.  Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section's sole discretion.  Any such prosecution may be premised on information provided by the Defendant or its personnel.  Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be

commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the Term of the cooperation obligations provided for in Paragraph 10 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

26.    In the event the Fraud Section determines that the Defendant has breached this Agreement, the Fraud Section agrees to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining next steps pursuant to Paragraph 25.

27.    In the event that the Fraud Section determines that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section or to the

Court, including the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

28.     The Defendant acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and is subsequently prosecuted for any crime, or if the breach constitutes a violation of the Defendant's probation. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

29.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant, make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 25-28 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Fraud Section shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

30.	The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters

23

between the Fraud Section and the Defendant; and (b) whether the Fraud Section has any objection to the release or statement.

## **Complete Agreement**

31.     This document, including the attachments, states the full extent of the Agreement between the parties.   There are no other promises or agreements, express or implied.   Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR AP OF SOUTH FLORIDA, LLC:**

Date: 3/19/26

By: _____
John C. Richter, Esq.
Authorized Signatory
AP of South Florida, LLC


Date: _____

By: _____
Amy D. Kossak
Andrew O'Connor
Ropes & Gray LLP
Outside counsel for AP of South Florida, LLC


Date: 3/19/26

By: _____
John C. Richter
Lucas M. Fields
King & Spalding LLP
Outside counsel for AP of South Florida, LLC


**FOR THE DEPARTMENT OF JUSTICE:**

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice


Date: _____

By: _____
Jamie de Boer
Assistant Chief
D. Keith Clouser
Trial Attorney

25

**AGREED:**

**FOR AP OF SOUTH FLORIDA, LLC:**

Date:_____          By: _____
                              John C. Richter, Esq.
                              Authorized Signatory
                              AP of South Florida, LLC


Date: *3/19/2026*             By: *Amy D. Kossak*
                              Amy D. Kossak
                              Andrew O'Connor
                              Ropes & Gray LLP
                              Outside counsel for AP of South Florida, LLC


Date:_____          By: _____
                              John C. Richter
                              Lucas M. Fields
                              King & Spalding LLP
                              Outside counsel for AP of South Florida, LLC


**FOR THE DEPARTMENT OF JUSTICE:**

                              LORINDA I. LARYEA
                              Chief, Fraud Section
                              Criminal Division
                              U.S. Department of Justice


Date:_____          By: _____
                              Jamie de Boer
                              Assistant Chief
                              D. Keith Clouser
                              Trial Attorney


25

**AGREED:**

**FOR AP OF SOUTH FLORIDA, LLC:**

Date:_____

By: _____
John C. Richter, Esq.
Authorized Signatory
AP of South Florida, LLC

Date:_____

By: _____
Amy D. Kossak
Andrew O'Connor
Ropes & Gray LLP
Outside counsel for AP of South Florida, LLC

Date:_____

By: _____
John C. Richter
Lucas M. Fields
King & Spalding LLP
Outside counsel for AP of South Florida, LLC

**FOR THE DEPARTMENT OF JUSTICE:**

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Date: 3/20/26

By: _Jamie de Boer_
Jamie de Boer
Assistant Chief
D. Keith Clouser
Trial Attorney

25

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and AP of South Florida, LLC ("APSF" or the "Defendant"), and the parties hereby agree and stipulate that the following information is true and accurate. APSF admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below that were taken on or after February 26, 2021. Had this matter proceeded to trial, APSF acknowledges that the Fraud Section would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information:

**Relevant Entities and Individuals**

1.      From in or around August 1988, through in or around February 2021, Fiorella Insurance Agency, Inc. ("Fiorella") was an insurance brokerage company. APSF was incorporated under the laws of Florida in January 2021. In February 2021, APSF purchased certain of the assets of Fiorella. After this asset purchase, APSF did business as "Fiorella Insurance Agency," and many of the managers and employees who had worked at Fiorella were hired as employees of APSF. Fiorella and APSF marketed and sold Affordable Care Act ("ACA") health plans throughout Florida.

2.      Strong Opportunities, LLC d/b/a Florida Care Insurance ("Florida Care") was a company formed under the laws of Florida. Florida Care marketed ACA Plans to consumers in Florida and in other states.

A-1

3.      Cory Lloyd ("Lloyd"), a resident of Martin County, Florida, was a part-owner of Fiorella until the APSF asset purchase. From in or around September 2016 through in or around February 2021, Lloyd also served as Fiorella's Chief Operating Officer. After the Fiorella asset purchase, Lloyd became President of APSF and he served in that position until November 2022.

4.      Dafud Iza ("Iza"), a resident of Martin County, Florida, was an Executive Vice President at Fiorella and, after the Fiorella asset purchase, an Executive Vice President at APSF.

5.      Steven Strong, a resident of Tarrant County, Texas, was the president and owner of Florida Care.

6.      Insurer 1 was a company incorporated under the laws of Florida. Insurer 1 provided health insurance plans throughout Florida, including federally subsidized ACA plans. Insurer 1 paid commissions to Fiorella and APSF for enrolling consumers in ACA plans issued by Insurer 1.

### The Fraud Scheme

7.       From in or around February 2021, and continuing through in or around September 2022, in Miami-Dade, Broward, Palm Beach, and St. Lucie Counties, in the Southern District of Florida, and elsewhere, APSF knowingly executed and attempted to execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any subsidy, insurance, and other form of Federal assistance, the value of which was $1,000,000 or more, that is, advanced premium tax credits ("APTCs" or "subsidies") offered under ACA plans, in violation of Title 18, United States Code, Section 1031. The scheme began in or around August 2018, prior to APSF's asset purchase of Fiorella, and was directed by Fiorella and APSF employees Cory Lloyd, Dafud Iza, and others. The scheme continued in substantially the same manner for approximately 18 months after APSF

A-2

completed the asset purchase of Fiorella, until APSF terminated the fraud scheme in September 2022. As part of the scheme, APSF submitted false and fraudulent applications for fully subsidized ACA plans on behalf of thousands of consumers. APSF also maintained ACA plans that Fiorella fraudulently enrolled, on which the federal government continued to pay subsidies. During the period February 2021 through September 2022, the government awarded at least $141.5 million in federal subsidies based on these false and fraudulent applications, and ultimately paid out at least $102.7 million of those subsidies.

### *The ACA Program*

8.      The ACA established a premium tax credit, which was a refundable tax credit designed to assist eligible individuals and families in affording health insurance purchased through an "Exchange." The amount of the subsidy available to a consumer was based on a sliding scale; consumers with lower incomes received a larger credit, while consumers with higher incomes received a smaller credit. To be eligible for a subsidy in Florida, a consumer's estimated household income generally had to be greater than 100% and less than 400% of the federal poverty level. Individuals with estimated incomes below the federal poverty level did not qualify for a subsidy. Consumers who were eligible for a subsidy could elect to receive their subsidy in advance, or they could claim a tax credit as a lump sum when they filed taxes. It was common for consumers to elect to receive their subsidy in advance, in which case the subsidy was paid directly to the insurer sponsoring the plan.

9.      Individuals were permitted to enroll in ACA plans during the annual open enrollment period. Open enrollment occurred during a set period each year, typically between November 1 of the calendar year preceding the benefit year through a date in December of the same year or January of the benefit year. A person could enroll outside of open enrollment only if

they qualified for a "special enrollment period" (or "SEP") triggered by, for example, certain qualifying life events ("QLEs"). SEPs generally lasted for 60 days following a qualifying life event. QLEs included: change in primary place of living; loss of health insurance; change in household size; change in eligibility for ACA plan coverage; and other qualifying situations.

### The Fraud Scheme

10.     As part of the scheme, Lloyd and Iza, as agents of APSF, worked with Strong and others to falsify and cause the falsification of thousands of ACA plan applications by misrepresenting consumers' incomes to make them appear eligible for subsidies when, in fact, they were not. APSF, through Lloyd, Iza, and others, also manipulated SEPs to enroll consumers in subsidized ACA plans year-round, in order to maximize the total volume of enrollments, including fraudulent enrollments.

11.     Lloyd, for the benefit of and on behalf of Fiorella and, later, APSF, engaged Strong and Florida Care to conduct "street marketing" campaigns for ACA plans. APSF paid Florida Care a commission in exchange for referring "qualified" consumers for enrollments in ACA plans. The street marketers recruited consumers at homeless shelters, bus stops, drug treatment clinics, and similar locations. As Lloyd, Iza, and others working as agents of APSF well knew, the street marketers at times offered bribes in the form of cash and gift cards to induce consumers to agree to enroll in ACA plans. The street marketers at times also coached consumers on how to falsely respond to application questions, including how to provide false responses to questions about income, and at times provided invalid identifiers for the individuals they referred for enrollment (i.e., referred consumers with social security numbers or other identifiers that did not match the consumer's reported name).

A-4

12. Lloyd, on behalf of and for the benefit of APSF, directed employees to enroll consumers referred by Strong and Florida Care in fully subsidized ACA plans. By enrolling consumers in fully subsidized plans, APSF ensured that the consumers had no financial responsibility to maintain the plan, since the subsidy payments fully covered the premiums. However, a substantial number of consumers referred by Strong and Florida Care to APSF had little to no qualifying income and were ineligible for subsidies. To ensure that these consumers could nonetheless be enrolled in subsidized plans, APSF, through Lloyd and other employees working on its behalf, used call scripts designed to induce consumers to falsely represent that they would attempt to make the minimum income required for a federal subsidy. At times, APSF employees told consumers that it did not matter if the consumer actually made the amount, just that they attempted to make the amount, which was false. APSF, through Lloyd, Iza, and other supervisory employees, authorized employees to "bump up," i.e., falsify and fraudulently increase, income to the minimum required for a federal subsidy.

13. This "bumping up" and falsification of income happened routinely on calls with consumers, and at times even after the interaction with the consumer had concluded. For example, APSF, through Lloyd, Iza, and other supervisors, directed call center employees to ask a consumer to agree that the consumer would attempt to make a certain income (often $13,000 a year, or another income near the federal poverty level for the applicable year), even where the consumer initially reported that his or her income was zero. This was often done without inquiry into the consumer's potential sources of income and without any good-faith basis to believe the consumer was going to make the minimum income. APSF also maintained a "processing" department that processed applications for ACA plans. Supervisors in the processing department, at Lloyd's direction, routinely authorized employees to "bump up" applicants' incomes to the minimum

A-5

amount required for a subsidy. APSF, through Lloyd and other employees working on its behalf, thus routinely caused reported incomes to be falsified to ensure the consumer would be enrolled in a fully subsidized plan. APSF, through Lloyd and other employees working on its behalf, did this for the purpose of maximizing enrollments in ACA plans, which in turn maximized APSF's commission payments from Insurer 1.

14.     Once a consumer was enrolled in an ACA plan, the Exchange often asked consumers to verify specific information, including income. If a consumer did not verify their income within a certain period of time, typically 90 days, the consumer was at risk of losing their subsidy. APSF, through Lloyd, Iza, and other supervisors, directed employees to perform "subsidy reviews" or "subsidy fixes" whereby employees accessed consumers' ACA plan information online and falsely indicated that the consumer experienced a "life change." For consumers referred by Strong and Florida Care, APSF typically did not contact the consumer before performing a "subsidy fix," did not attempt to verify the consumer's income, and had no basis for representing that the consumer had experienced a life change. This process ensured that the consumer did not lose the subsidy at the end of the 90-day verification window.

15.     Finally, APSF, through Lloyd, Iza, and other supervisory employees, directed employees to routinely secure false and fraudulent "Medicaid denials" on behalf of consumers and used those Medicaid denials to enroll consumers in ACA plans outside of open enrollment, all to circumvent the limitations of open enrollment. In truth and in fact, the consumers had not reported to APSF that they experienced a job change, loss of coverage, move, marriage, or similar qualifying life event that would entitle the consumer to enroll in an ACA plan outside of open enrollment. Instead, APSF, through Lloyd, Iza, and other supervisory employees, directed employees to submit false and fraudulent Medicaid applications for large volumes of consumers,

A-6

including consumers referred by Strong and Florida Care, in a manner designed to secure a denial. APSF, through Lloyd, Iza, and other supervisory employees, directed employees to use these denials to falsely represent to the Exchange that the consumers qualified for an SEP because they had recently received a Medicaid denial. Through this process, APSF could enroll consumers in ACA plans at any time during the year, circumventing open enrollment and special enrollment limitations. APSF, through Lloyd, Iza, and other supervisory employees, directed employees to use this process to submit numerous applications for ACA plans containing false and fraudulent income amounts on behalf of consumers referred by Strong and Florida Care.

16. As a result of these false and fraudulent enrollments, some consumers experienced disruptions in their medical care, including disruptions in the treatment of mental health, substance abuse, and other disorders. At times, consumers faced unaffordable co-pays and other costs because APSF, through Lloyd, Iza, and other employees, enrolled these consumers in plans without regard to the consumers' medical needs, the availability of other programs (including Medicaid and local assistance programs), and consumers' ability to pay out-of-pocket costs. Some consumers who APSF fraudulently enrolled into fully subsidized ACA Plans lost access to free health benefits through Medicaid or local assistance programs, and as a result such consumers faced increased costs in accessing HIV medication, medication to treat opioid dependence, and medication to treat mental health disorders.

17. In total, APSF submitted false and fraudulent applications for thousands of consumers referred by Strong and Florida Care and also maintained ACA plans that Fiorella fraudulently enrolled, on which the federal government continued to pay subsidies. The government awarded at least $141.5 million in subsidies on these ACA plans during the period of

February 2021 through September 2022. Of this amount, at least $102.7 million in subsidies were paid by the government.

18.    As part of the scheme, on or about April 8, 2021, APSF submitted or caused to be submitted an ACA plan application that contained a false and fraudulent income amount on behalf of consumer P.B.

**AGREED:**

A-8

**FOR AP OF SOUTH FLORIDA, LLC:**

Date: 3/19/26

By: _____
John C. Richter, Esq.
Authorized Signatory
AP of South Florida, LLC


Date:_____

By: _____
Amy D. Kossak
Andrew O'Connor
Ropes & Gray LLP
Outside counsel for AP of South Florida, LLC

Date: 3/19/26

By: _____
John C. Richter
Lucas M. Fields
King & Spalding LLP
Outside counsel for AP of South Florida, LLC

**FOR THE DEPARTMENT OF JUSTICE:**

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Date:_____

By: _____
Jamie de Boer
Assistant Chief
D. Keith Clouser
Trial Attorney

A-9

**FOR AP OF SOUTH FLORIDA, LLC:**

Date:_____          By: _____
                             John C. Richter, Esq.
                             Authorized Signatory
                             AP of South Florida, LLC


Date: _3/19/2026_            By: _Amy D. Kossak_
                             Amy D. Kossak
                             Andrew O'Connor
                             Ropes & Gray LLP
                             Outside counsel for AP of South Florida, LLC


Date:_____          By: _____
                             John C. Richter
                             Lucas M. Fields
                             King & Spalding LLP
                             Outside counsel for AP of South Florida, LLC


**FOR THE DEPARTMENT OF JUSTICE:**

                             LORINDA I. LARYEA
                             Chief, Fraud Section
                             Criminal Division
                             U.S. Department of Justice


Date:_____          By: _____
                             Jamie de Boer
                             Assistant Chief
                             D. Keith Clouser
                             Trial Attorney


A-9

**FOR AP OF SOUTH FLORIDA, LLC:**

Date:_____              By: _____
                                  John C. Richter, Esq.
                                  Authorized Signatory
                                  AP of South Florida, LLC


Date:_____              By: _____
                                  Amy D. Kossak
                                  Andrew O'Connor
                                  Ropes & Gray LLP
                                  Outside counsel for AP of South Florida, LLC


Date:_____              By: _____
                                  John C. Richter
                                  Lucas M. Fields
                                  King & Spalding LLP
                                  Outside counsel for AP of South Florida, LLC


**FOR THE DEPARTMENT OF JUSTICE:**

                                  LORINDA I. LARYEA
                                  Chief, Fraud Section
                                  Criminal Division
                                  U.S. Department of Justice

Date: 3/20/26                     By: _Jamie de Boer_
                                  Jamie de Boer
                                  Assistant Chief
                                  D. Keith Clouser
                                  Trial Attorney

A-9

**ATTACHMENT B**

**<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>**

WHEREAS, AP of South Florida, LLC (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to the Fraud Section's investigation of Major Fraud Against the United States, in violation of Title 18, United States Code, Section 1031; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a Plea Agreement with the Fraud Section (the "Agreement"); and

WHEREAS, the Company's outside counsel has advised the Board of Managers of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section;

Therefore, the Board of Managers has RESOLVED that:

1.      The Company (a) acknowledges the filing of the one-count Information charging the Company with one count of Major Fraud Against the United States, in violation of Title 18, United States Code, Section 1031; (b) waives indictment on such charges and enters into the Agreement with the Fraud Section; and (c) agrees to pay restitution totaling $27,630,820, and to pay such restitution as required by the Agreement;

2.      The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the

B-1

Agreement of any objection with respect to venue, and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of Florida; (c) a knowing waiver of any defenses based on the statute of limitations for any criminal prosecution by the Fraud Section relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Offices prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement; and (d) a knowing waiver of appeal to the right to appeal the sentence imposed pursuant to Title 18, United States Code, Section 3742, and a knowing waiver of the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum set forth in this Agreement (or the manner in which that sentence was determined);

3.      John C. Richter, acting in his capacity as outside counsel to the Company and not in any personal capacity (the "Authorized Signatory"), is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Managers at this meeting with such changes as the Board of Managers of the Company may subsequently approve;

4.      The Authorized Signatory is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Authorized Signatory, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption

of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on

behalf of the Company.

Date: ___3/19/26___                    By: _____
                                       John C. Richter, Esq., Authorized Signatory
                                       AP of South Florida, LLC

B-3